09-2778-cv(L)
*Balintulo v. Daimler AG*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: January 11, 2010                    Decided: August 21, 2013)

Docket Nos. 09-2778-cv(L), 09-2779-cv,
09-2780-cv, 09-2781-cv, 09-2783-cv, 09-2785-cv,
09-2787-cv, 09-2792-cv, 09-2801-cv, 09-3037-cv

_____

SAKWE BALINTULO, as personal representative of SABA BALINTULO, DENNIS
VINCENT FREDERICK BRUTUS, MARK FRANSCH, as personal representative of
ANTON FRANSCH, ELSIE GISHI, LESIBA KEKANA, ARCHINGTON MADONDO, as
personal representative of MANDLA MADONDO, MPHO ALFRED MASEMOLA,
MICHAEL MBELE, MAMOSADI CATHERINE MLANGENI, REUBEN MPHELA, THULANI
NUNU, THANDIWE SHEZI, THOBILE SIKANI, LUNGISLIE NTSEBEZA, MANTOA
DOROTHY MOLEFI, individually and on behalf of her deceased son, MNCEKELELI
HENYN SIMANGENTLOKO, TOZAMILE BOTHA, MPUMELELO CILIBE, WILLIAM
DANIEL PETERS, SAMUEL ZOYISILE MALI, MSITHELI WELLINGTON NONYUKELA,
JAMES MICHAEL TAMBOER, NOTHINI BETTY DYONASHE, individually and on behalf
of her deceased son, NONKULULEKO SYLVIA NGCAKA, individually and on behalf of
her deceased son, HANS LANGFORD PHIRI, MIRRIAM MZAMO, individually and on
behalf of her deceased son,

*Plaintiffs-Appellees,*

—v.—

DAIMLER AG, FORD MOTOR COMPANY, and
INTERNATIONAL BUSINESS MACHINES CORPORATION,

*Defendants-Appellants.*

_____

Before: CABRANES, HALL, and LIVINGSTON, Circuit Judges.

The question presented is whether to issue a writ of mandamus to the United States District Court for the Southern District of New York (Shira A. Scheindlin, *Judge*) to resolve in the defendants' favor these proposed class-action suits brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, on behalf of those harmed by the decades-long South African legal regime known as "apartheid." The plaintiffs seek damages for violations of customary international law committed by the South African government, allegedly aided and abetted by the South African subsidiary companies of the named corporate defendants—Daimler, Ford, and IBM. In short, the plaintiffs claim that these subsidiary companies sold cars and computers to the South African government, thus making the defendants, their parent companies, liable for the apartheid regime's innumerable race-based depredations and injustices, including rape, torture, and extrajudicial killings.

Although the plaintiffs did not claim that any of the South African government's alleged violations of the law of nations occurred in the United States, at the time they filed their complaint they assumed (as did most American courts) that no such geographical connection was necessary. Based on the same assumption, the District Court denied the defendants' motion to dismiss, which had asserted various grounds for dismissal, including that claims brought under the ATS cannot be based on "extraterritorial" conduct—i.e., conduct that occurred in the territory of a sovereign other than the United States. The District Court denied a motion to certify an interlocutory appeal, and the defendants thereupon sought immediate appellate review through a writ of mandamus and by invocation of the "collateral order" doctrine.

This putative appeal, held in abeyance pending a decision by the Supreme Court that was not issued until 2013, and now pending for four years, involves challenging and important questions regarding the immediate appealability of certain orders in cases brought under the Alien Tort Statute, where the United States government has informed the district court that the ongoing

2

litigation substantially threatens American foreign policy. We no longer need to answer those questions, however, because all of the underlying claims are plainly barred by the recent opinion of the Supreme Court in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), which held that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in the territory of another sovereign. *Id.* at 1668–69. Because that decision provides a sufficient ground for dismissing all of the remaining claims, we deny mandamus relief. For the same reason, we conclude that the interests of judicial economy, and of the parties, are best served by holding this putative appeal in abeyance and enabling the District Court to consider a motion to dismiss the plaintiffs' remaining claims. The parties can then inform this Court, when appropriate, whether this appeal has been rendered moot.

Accordingly, the petition for a writ of mandamus is **DENIED**; the stay on proceedings in the District Court is **VACATED**; and any appellate jurisdiction that this Court may have pursuant to the collateral order doctrine is held in abeyance.

> LISA S. BLATT (Peter L. Zimroth, Ramon P. Marks, Marcus A. Asner, *on the brief*), Arnold & Porter LLP, Washington, DC, and New York, NY; (Jerome S. Hirsch, Joseph N. Sacca, Gary J. Hacker, *on the brief*), Skadden, Arps, Slate, Meagher, & Flom LLP, New York, NY, *for Defendant-Appellant Daimler AG.*

> SRI SRINIVASAN (Brian C. Anderson, Irving L. Gornstein, Anton Metlitsky, *on the brief*), O'Melveny & Myers LLP, Washington, DC, *for Defendant-Appellant Ford Motor Company.*

> Keith R. Hummel, Teena-Ann Sankoorikal, James E. Canning, John E. Lazar, Cravath, Swaine, & Moore, LLP, New York, NY, *for Defendant-Appellant IBM Corporation.*

3

STEIG OLSON (Michael D. Hausfeld, Ralph J. Bunche, *on the brief*), Hausfeld, LLP, New York, NY, and Washington, DC; (Robert G. Kerrigan, *on the brief*), Kerrigan, Estess, Rankin & McLeod, LLP, Pensacola, FL; (Matt Schultz, *on the brief*), Levin Papantonio Thomas Mitchell Echsner & Proctor, PA, Pensacola, FL; (Charles Peter Abrahams, *on the brief*), Abrahams Kiewitz, Cape Town, South Africa; *for Plaintiffs-Appellees Sakwe Balintulo et al.*

PAUL L. HOFFMAN (Adrienne Quarry, *on the brief*), Schonbrun Desimone Seplow Harrison & Hoffman, Venice, CA; (Jay J. Rice, Diane E. Sammons, *on the brief*), Nagel Rice, LLP, Roseland, NJ; (Tyler R. Giannini, Susan Farbstein, *on the brief*), International Human Rights Clinic, Human Rights Program, Harvard Law School, Cambridge, MA; (Judith Brown Chomsky, *on the brief*), Law Offices of Judith Brown Chomsky, Elkins Park, PA; (Helen I. Zeldes, *on the brief*), Zeldes & Haeggquist, LLP, San Diego, CA; (Dumisa Buhle Ntsebeza, *on the brief*), Duma Nokwe Group of Advocates, Sandton, South Africa; (Michael Francis Osborne, *on the brief*), Cape Town, South Africa; (John Sindiso Ngcebetsha, Gugulethu Oscar Madlanga, *on the brief*), Ngcebetsha Madlanga Attorneys, Randburg, South Africa; (Medi Mokuena, *on the brief*), Mokuena Attorneys, Johannesburg, South Africa); (Dan Stormer, Anne Richardson, *on the brief*), Hadsell Stormer Keeny Richardson & Renick LLP, Pasadena, CA; (Anthony DiCaprio, *on the brief*), Rye, NY; *for Plaintiffs-Appellees Lungisile Ntsebeza et al.*

LEWIS S. YELIN (Ian Heath Gershengorn, Acting Assistant Attorney General, Douglass N. Letter, Robert M. Loeb, Appellate Staff, *on the brief*), Civil Division, U.S. Department of Justice, Washington, DC; (Preet Bharara, U.S. Attorney, and David S. Jones, Assistant U.S. Attorney, *on the brief*), Office of the U.S. Attorney for the Southern District of New York, NY; (Joan E. Donoghue, *on the brief*), U.S. Department of State, Washington, DC; *for Amicus Curiae United States of America, in support of Plaintiffs-Appellees.*

Peter R. Rutledge, Athens, GA; Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Inc., Washington, DC; *for Amicus Curiae Chamber of Commerce of the United States, in support of Defendants-Appellants.*

4

Klaus Botzet, Embassy of the Federal Republic of Germany, Washington, DC, *for Amicus Curiae Federal Republic of Germany, in support of Defendants-Appellants.*

Alan E. Untereiner, Mark T. Stancil, Damon W. Taaffe, Eva A. Temkin, Ariel N. Lavinbuk, Robbins, Russel, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC, *for Amici Curiae Federation of German Industries, Association of German Chambers of Industry and Commerce, and German American Chambers of Commerce, in support of Defendants-Appellants.*

Terry Myers, Jeffrey L. Nagel, Gibbons, P.C., New York, NY, *for Amici Curiae German Law Professors, in support of Defendants-Appellants.*

Anthony D. Boccanfuso, Arnold & Porter, LLP, New York, NY, *for Amici Curiae International Chamber of Commerce, in support of Defendants-Appellants.*

Terry Myers, Jeffrey L. Nagel, Gibbons, P.C., New York, NY, *for Amici Curiae International Law Professors, in support of Defendants-Appellants.*

Jeffrey A. Lamken, Evan A. Young, Baker Botts L.L.P., Washington, DC, and Austin, TX, *for Amici Curiae National Foreign Trade Council, USA\*Engage, U.S. Council for International Business, Organization for International Investment, and National Association of Manufacturers, in support of Defendants-Appellants.*

Julian Ku, Hofstra University Law School, Hempstead, NY; Michael D. Ramsey, University of San Diego Law School, San Diego, CA; *for Amici Curiae Law Professors of International Law and U.S. Foreign Relations Law, in support of Defendants-Appellants.*

Marco B. Simons, Richard L. Herz, Jonathan G. Kaufman, EarthRights International, Washington, DC, *for Amicus Curiae EarthRights International, in support of Plaintiffs-Appellees.*

Steven A. Kanner, Freed Kanner London & Millen LLC, Bannockburn, IL, *for Amici Curiae Former Commissioners and Committee Members of South Africa's Truth and Reconciliation Commission, in support of Plaintiffs-Appellees.*

Piper Hendricks, World Organization for Human Rights USA, Washington, DC, *for Amicus Curiae International Center for Transitional Justice, in support of Plaintiffs-Appellees.*

William J. Aceves, California Western School of Law, San Diego, CA, *for Amici Curiae International Law Scholars, in support of Plaintiffs-Appellees.*

Robert N. Kaplan, Gregory K. Arenson, Kaplan Fox Kilsheimer LLP, New York, NY, *for Amicus Curiae Joseph E. Stiglitz, in support of Plaintiffs-Appellees.*

Maria C. LaHood, Katherine Gallagher, Meena Jagannath, Blinne Ni Ghralaigh, Center for Constitutional Rights, New York, NY, *for Amici Curiae Non-Governmental Organizations Committed to Human Rights, in support of Plaintiffs-Appellees.*

Renae D. Steiner, Heins Mills & Olson, P.L.C., Minneapolis, MN, *for Amici Curiae Professor John Dugard and Advocate Anton Katz, in support of Plaintiffs-Appellees.*

Elizabeth J. Cabraser, Steve M. Swerdlow, Lieff Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Agnieszka M. Fryszman, Maureen E. McOwen, Cohen Milstein Sellers & Toll PLLC, Washington, DC; and Jennifer M. Green, University of Minnesota School of Law, Minneapolis, MN; *for Amici Curiae Professors of Civil Procedure, in support of Plaintiffs-Appellees.*

Bernard Persky, Kellie Lerner, Labaton Sucharow LLP, New York, NY, *for Amici Curiae Professors of Federal Jurisdiction and Legal History, in support of Plaintiffs-Appellees.*

Eugene A. Spector, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, *for Amicus Curiae South African Council of Churches, in support of Plaintiffs-Appellees.*

Terry Collingsworth, Conrad & Scherer, LLP, Washington, DC, *for Amicus Curiae Congress of South African Trade Unions, in support of Plaintiffs-Appellees.*

Richard L. Herz, Marco B. Simons, Jonathan G. Kaufman, EarthRights International, Washington, DC, *for Amici Curiae U.S. Diplomats, in support of Plaintiffs-Appellees.*

Luis Romero Requena, European Commission, Brussels, Belgium, *for Amicus Curiae European Commission.*

David B. Goldstein, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York, NY, *for Amicus Curiae Republic of South Africa.*

Nigel Sheinwald*, British Embassy Washington, Washington, DC, for Amicus Curiae United Kingdom of Great Britain and Northern Ireland.*

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether to issue a writ of mandamus to resolve in favor of the defendants this long-lived litigation under the Alien Tort Statute ("ATS")—a statute, passed in 1789, that was rediscovered and revitalized by the courts in recent decades to permit aliens to sue for alleged serious violations of human rights occurring abroad. The statute was first deployed in 1980 against individual defendants alleged to have perpetrated crimes against humanity, and beginning in 1997, some courts have extended its reach to suits against corporate defendants as well. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 116 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013). We consider this question in light of the Supreme Court's recent decision that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in another country.

In these putative class-action suits brought on behalf of those harmed by the decades-long South African legal regime known as "apartheid," the plaintiffs assert that the South African subsidiary companies of the named corporate defendants—Daimler, Ford, and IBM (the "defendants")—aided and abetted violations of customary international law committed by the South African government.[1] In short, the plaintiffs claim that these subsidiary companies sold cars and

---

[1] The suits were originally brought by two groups of plaintiffs, the *Balintulo* plaintiffs (also referred to as the *Khulumani* plaintiffs) and the *Ntsebeza* plaintiffs, *see* Part I.A, *post*, against a broad and diverse group of corporate defendants, over fifty in number and representing a broad cross-section of the international economy.

7

computers to the South African government, thus facilitating the apartheid regime's innumerable race-based depredations and injustices, including rape, torture, and extrajudicial killings.

The plaintiffs brought these suits over ten years ago in federal court under the ATS, which confers federal jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Although the plaintiffs did not claim that any of the South African government's alleged violations of the law of nations[2] occurred in the United States, at the time they filed their complaint they assumed (as did most

---

The *Balintulo* plaintiffs sued twenty-three named foreign and domestic corporations: AEG Daimler-Benz Industrie, Barclays National Bank Ltd., British Petroleum, PLC, ChevronTexaco Corp., ChevronTexaco Global Energy, Inc., Citigroup, Inc., Commerzbank, Credit Suisse Group, DaimlerChrysler AG, Deutsche Bank AG, Dresdner Bank AG, Exxon Mobil Corp., Fluor Corp., Ford Motor Co., Fujitsu, Ltd., General Motors Corp., IBM Corp., J.P. Morgan Chase, Rheinmetall Group AG, Rio Tinto Group, Shell Oil Co., Total-Fina-Elf, and UBS AG.

The *Ntsebeza* plaintiffs sued fifty-five defendants, including Amdahl Corp., American Isuzu Motors, Inc., Anglo-American Corp., Banque Indo Suez, Bank of America, N.A., Barclays Bank PLC, Citigroup Inc., Bristol-Meyers Squibb Co., Burroughs Corp., Chemical Bank & Chase Manhattan Bank, Chevron Texaco Corp., Citigroup AG, Coca-Cola Co., Colgate Palmolive, Commerzbank AG, Crédit Agricole S.A., Crédit Lyonnais, Credit Suisse Group, Daimler Chrysler Corp., De Beers Corp., Deutsche Bank AG, The Dow Chemical Co., Dresdner Bank AG, E.I. Dupont de Nemours and Co., EMS-Chemie (North America) Inc., Exxon Mobil Corp., Ford Motor Co., General Electric Co., General Motors Corp., Hewlett-Packard Co., Holcim, Inc., Holcim, Ltd., Honeywell International, Inc., ICL, Ltd., J.P. Morgan, IBM Corp., Manufacturers Hanover Corp., Merrill Lynch & Co. Inc., Minnesota Mining and Manufacturing Co. (3M Co.), National Westminster Bank PLC, Nestle USA, Inc., Novartis AG, Oerlikon Bührle AG, Oerlikon Contraves AG, Royal Dutch Petroleum Co., Schindler Holding AG, Securities Inc., Shell Oil Co., Shell Petroleum, Inc., Shell Transport & Trading Co. PLC, Sperry Corp., Standard Chartered, P.L.C., Sulzer AG, UBS AG, Unisys Corp., Xerox Corp., along with unnamed corporations and various named and unnamed corporate officers.

The three defendants in the instant appeal—Daimler, Ford, and IBM—are all that remain.

[2] A violation of the "law of nations," we have consistently explained, is one that violates "customary international law," *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 237 n.2 (2d Cir. 2003) (internal citations omitted), "composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern," *id.* at 248, *i.e.*, "the specific and universally accepted rules that the nations of the world treat as binding *in their dealings with one another*," *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 118 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013). As Judge Friendly explained long ago, these rules include only "those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings *inter se*." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010); *see also Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980) ("It is only where the nations of the world have demonstrated that the wrong is of *mutual*, and not merely *several*, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the [ATS]." (emphasis supplied)). The wrongs condemned by customary international law include those heinous criminal offenses that fall under the general headings of war crimes and crimes against humanity. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 257 n.7 (2d Cir. 2009); *see also United States v. Yousef*, 327 F.3d 56, 103–04 (2d Cir. 2003) (noting the "strictly limited set of crimes" that are "uniformly recognized by the 'civilized nations' as . . . offense[s] against the 'Law of Nations'"). Certain violations of customary international law, however, can become actionable in *civil* lawsuits by virtue of legislative command. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 738 n.29 (2004) (noting the distinction between a rule of customary international law and a private right of action); *see also Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (identifying a similar principle with respect to treaty law).

American courts at that time[3]) that no such geographical connection was necessary.  Based, in part, on that assumption, the United States District Court for the Southern District of New York (Shira A. Scheindlin, *Judge*)[4] denied a motion to dismiss by the defendants, and allowed the suits to proceed. *See In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 246, 296  (S.D.N.Y. 2009).

Although parties usually cannot appeal while district court proceedings are ongoing, the defendants sought immediate review of the District Court's denial of their motion to dismiss in this Court, first through a motion to certify an interlocutory appeal, which the District Court denied, and thereupon through either a writ of mandamus or under the "collateral order" doctrine[5]—both of which permit immediate appellate review of certain types of particularly important decisions by a district court.  In pursuing appellate review, the defendants claimed (1) that the case should be dismissed because it threatened significant United States foreign-policy interests, as explained in a statement of interest filed by the U.S. government; (2) that the jurisdiction conferred by the ATS does not permit suits against corporations or apply to acts committed outside of the United States; and (3) that the District Court erroneously imposed accessorial liability.  We then granted the defendants' motion for a stay of all proceedings, putting the District Court proceedings on pause while we considered this case.

Now on appeal for over four years, this case has been overtaken by recent events.  Most significantly, the Supreme Court held, as a matter of United States law, that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in the territory of

---

[3] *See, e.g.*, *Flomo v. Firestone Nat'l Rubber Co., LLC*, 643 F.3d 1013, 1025 (7th Cir. 2011) ("[N]o court to our knowledge has ever held that [the ATS] doesn't apply extraterritorially.").

[4] The suits were brought in various districts but were transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation.  *See In re South African Apartheid Litigation*, 238 F. Supp. 2d 1379 (JPML 2002).  The cases were originally assigned to Judge John E. Sprizzo, but they were reassigned to Judge Shira A. Scheindlin following the death of Judge Sprizzo in 2008.

[5] *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 146 (2d Cir. 2013).

another sovereign. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1668–69 (2013).[6] Additionally, the South African government—which had previously opposed the suits because they "interfere[d] with the policy embodied by its Truth and Reconciliation Commission," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004)—reversed its position in September 2009 after a change in governmental leadership. After this series of twists and turns, the parties submitted supplemental briefing, and we have now reached a decision.

The opinion of the Supreme Court in *Kiobel* plainly bars common-law suits, like this one, alleging violations of customary international law based solely on conduct occurring abroad. Because of that unambiguous holding, the defendants will be able to obtain their desired relief (dismissal of all claims) in the District Court through a motion for judgment on the pleadings, without resort to a writ of mandamus. The defendants' request for mandamus relief is therefore denied. For the same reason, we need not consider the defendants' argument under the collateral order doctrine. Instead, we vacate our stay on the District Court proceedings so that the defendants may move for judgment on the pleadings. We reserve the question whether we have jurisdiction under the collateral order doctrine and hold the putative appeal under that doctrine in abeyance pending further notice from the parties.

## I. Background

### A. The Pleadings

These consolidated cases come to us as a continuation of litigation on which the District Court, this Court, and even the Supreme Court, have already spoken at length. *See* Part I.B., *post.* In the latest iteration of pleadings, which have been amended twice, the plaintiffs assert that the South African subsidiaries of the various corporate defendants aided and abetted in violations of

---

[6] This decision followed in time our holdings that "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone," *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009), and that customary international law does not presently recognize corporate liability, *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *reh'g en banc denied*, 642 F.3d 379 (2011).

customary international law during the repressive "apartheid" legal regime in South Africa. The

District Court summarized these allegations as follows:

> Plaintiffs in the first action, *Ntsebeza v. Daimler A.G.* ("*Ntsebeza* plaintiffs"), allege that they suffered discriminatory employment practices, employment retaliation for political beliefs, geographic segregation, arbitrary arrest and detention, torture, forced exile, arbitrary denationalization, and the extrajudicial killing of family members. The *Ntsebeza* plaintiffs bring a class action on behalf of "themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries" as a result of defendants' direct and secondary violations of the law of nations.

> Plaintiffs in the second action, *Khulumani v. Barclays National Bank Ltd.* ("*Khulumani* plaintiffs"), include both Khulumani—a South African organization that "works to assist victims of apartheid-era violence"—and individuals who suffered geographic segregation, arbitrary arrest and detention, rape, torture, and the extrajudicial killing of family members. . . .

> . . . .

> The *Ntsebeza* plaintiffs allege that the automotive defendants—or their agents or alter egos—committed both direct and secondary violations of the law of nations by engaging in workplace discrimination that mimicked and enhanced apartheid, suppressing union activities, manufacturing military vehicles for the South African security forces in the face of worker protests, and assisting security forces in identifying and torturing anti-apartheid leaders. The *Ntsebeza* plaintiffs additionally allege that defendant IBM—or its agents or alter egos—committed secondary violations of the law of nations by providing the computer hardware, software, maintenance, and support necessary for the South African Government to carry out geographic segregation and denationalization. . . .

> The *Khulumani* plaintiffs allege that the automotive defendants aided and abetted violations of the law of nations by supplying vehicles, parts, and other equipment to the apartheid security forces. The *Khulumani* plaintiffs additionally allege that the technology defendants aided and abetted violations of the law of nations by providing the computer systems necessary to restrict black South Africans' movements, track dissidents, and target particular individuals for repressive acts.

*In re South African Apartheid Litig.*, 617 F. Supp. 2d at 241–43.

### B. Procedural History

"The tortuous procedural history of these cases dates back to the filing of complaints in

2002." *In re South African Apartheid Litig.*, 624 F. Supp. 2d 336, 338 (S.D.N.Y. 2009).[7] As relevant

---

[7] *See In re South African Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004), *aff'd in part, vacated in part*, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) (per curiam), *aff'd for want of a quorum sub nom.*, *Am. Isuzu Motors, Inc., v.*

here, Judge Sprizzo, then presiding, dismissed the plaintiffs' claims under the ATS for lack of subject-matter jurisdiction, holding that the plaintiffs had not alleged a violation of "well-accepted and clearly-defined" norms of customary international law. *In re South African Apartheid Litig.*, 346 F. Supp. 2d 538, 546, 548 (S.D.N.Y. 2004). We reversed that judgment in part, explaining in a *per curiam* opinion that "a plaintiff may plead a theory of aiding and abetting liability" under the ATS, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam), but we declined to reach other arguments, and instead permitted the plaintiffs to replead, *id.* at 260–61.[8] After the defendants sought a writ of certiorari, the Supreme Court affirmed our decision for want of a quorum. *See Am. Isuzu Motors, Inc., v. Ntsebeza*, 553 U.S. 1028 (2008) (Mem.).

On remand, the plaintiffs filed an amended complaint, this time naming only eight defendants.[9] With the exception of one defendant that contested personal jurisdiction, the defendants then filed a joint motion to dismiss on various grounds, including doctrines of case-specific deference and international comity, lack of jurisdiction over corporations under the ATS, lack of extraterritorial reach for causes of action under the ATS, and the absence of aiding-and-abetting liability under the federal common law, as developed pursuant to *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Judge Scheindlin, to whom the case was assigned following the death of Judge Sprizzo, rejected each of these arguments, and held that the suit could proceed on an agency theory, under which the corporate defendants could be held liable for the actions of their South African

---

*Ntsebeza*, 553 U.S. 1028 (2008) (Mem.), *on remand*, *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009); *see also Sosa*, 542 U.S. at 733 n.21 (referring, by name, to this particular suit as one that may warrant dismissal, and commenting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy").

[8] Each of the three judges on the *Khulumani* panel filed a separate opinion. 504 F.3d at 264–84 (Katzmann, J., concurring); *id.* at 284–92 (Hall, J., concurring); *id.* at 292–337 (Korman, J., dissenting).

[9] The *Ntsebeza* plaintiffs named Ford, General Motors Corp., Daimler, IBM, and Barclays Bank PLC. The *Balintulo* plaintiffs named those five companies as well as UBS AG, Fujitsu Ltd., and Rheinmetall AG.

subsidiaries.[10]  *See In re South African Apartheid Litig.*, 617 F. Supp. 2d at 274–76.  She explained that the South African subsidiary companies could be liable as accessories based on their *knowledge* that their dealings with the South African government facilitated the many evils of apartheid, even if the companies did not *intend* their assistance to have that effect.[11]  *Id.* at 259–62.  Following the District Court's denial of certification, *see In re South African Apartheid Litig.*, 624 F. Supp. 2d 336 (S.D.N.Y. 2009), the defendants brought this petition for a writ of mandamus, and a putative appeal under the collateral order doctrine, arguing that "the District Court's denial of dismissal should be reversed, and the cases remanded with instructions to dismiss the complaints."  Defendants' Br. 59.[12]

We initially heard argument on a variety of preliminary motions on September 1, 2009.  Only a day after argument, we received a letter from the South African government reversing its earlier position and declaring that it was "now of the view that [the United States District Court for the Southern District of New York] is an appropriate forum to hear the remaining claims of aiding and abetting in violation of international law."  *See* Letter of Jeffrey Thamsanqa Radebe, Minister of Justice and Constitutional Development, Sept. 2, 2009; *see also Sosa*, 542 U.S. at 733 n.21 (explaining

---

[10] Judge Scheindlin dismissed claims made by the *Khulumani* (or *Balintulo*) plaintiffs in the First Amended complaint on the basis of insufficient allegations concerning vicarious liability, *see In re South African Apartheid Litig.*, 617 F. Supp. 2d at 275-76, but she allowed those claims to proceed once the plaintiffs amended the complaint a second time.

[11] Our Court later held that "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009).  Accordingly, "supplying . . . equipment to a local government will not support the imposition of aiding and abetting liability . . . for that government's abuses unless the [defendant] acted *with a purpose* to promote or advance those violations."  *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 158 (2d Cir. 2010) (Leval, J., concurring).  The District Court denied certification with respect to this issue, stating that the plaintiffs had, in its view, "advanced numerous allegations evincing specific intent, particularly concerning the automotive defendants," and therefore "[e]ven if the Second Circuit or the Supreme Court were to determine that intent or shared purpose is the proper *mens rea* requirement, plaintiffs would undoubtedly fight on."  *See In re South African Apartheid Litig.*, 624 F. Supp. 2d at 343.  The defendants, however, also argue that our decision in *Presbyterian Church*—which adopted a rule proposed by Judge Katzmann's concurring opinion in *Khulumani* as the law of the Circuit, *see* 582 F.3d at 258—addresses only the *threshold* question whether, and by what *mens rea* standard, a court has *subject-matter jurisdiction* under the ATS for aiding-and-abetting liability, leaving open the secondary question whether federal courts should "decline to provide a cause of action," as a matter of federal common law, for accessorial liability.  *Khulumani*, 504 F.3d at 269 (Katzmann, J., concurring); *see id.* at 267–68, 283 n.18.  Because of our disposition of this case, we have no occasion to address that argument.

[12] Because we consider only whether to issue mandamus, and not whether the District Court's order was appealable under the collateral order doctrine, we do not address the plaintiffs' argument that the defendants' notice of appeal was untimely.  *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 378–79 (2004).

13

the South African government's prior position). We then stayed the District Court proceedings[13] and ordered a limited remand to that Court "for the sole purpose of permitting defendants to move to certify an interlocutory appeal" on the question whether the ATS recognizes corporate liability. Order of Dec. 18, 2009. The District Court denied certification, explaining that although the question of corporate liability under the ATS was "a controlling issue of law" that "could materially advance the ultimate termination of this litigation," that question was "long-settled . . . in this Circuit," with "no substantial ground for disagreement." *In re South African Apartheid Litig.*, 2009 WL 5177981, at *2 (S.D.N.Y. Dec. 31, 2009) (quotation marks omitted).

Less than a year later, this Court (in a separate case) held that "the Alien Tort Statute does not provide subject matter jurisdiction over claims against corporations" based on asserted violations of customary international law. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *reh'g en banc denied*, 642 F.3d 379 (2011). The Supreme Court granted certiorari and, after reargument,[14] affirmed our judgment on different grounds, holding that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in the territory of

---

[13] *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (noting authority to stay proceedings pending mandamus review).

[14] The Supreme Court initially granted the petition for a writ of certiorari on October 17, 2011. *See Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 472 (2011) (Mem.). The petition raised the following two questions:

> 1. Whether the issue of corporate civil tort liability under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, is a merits question, as it has been treated by all courts prior to the decision below, or an issue of subject matter jurisdiction, as the court of appeals held for the first time.

> 2. Whether corporations are immune from tort liability for violations of the law of nations such as torture, extrajudicial executions or genocide, as the court of appeals decisions provides, or if corporations may be sued in the same manner as any other private party defendant under the ATS for such egregious violations, as the Eleventh Circuit has explicitly held.

Petition for Writ of Certiorari, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491, 2011 WL 2326721, at *i.

The Court heard argument on February 28, 2012, and then on March 5, 2012, ordered supplemental briefing and reargument to consider the following question:

> Whether and under what circumstances the Alien Tort Statute, 28 U.S.C. § 1350, allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States.

*Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 1738 (2012) (Mem.). The Court heard reargument on October 1, 2012, and issued its decision on April 17, 2013. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

14

another sovereign. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1668–69 (2013). With respect to the present suit, we then requested, and have now received, supplemental briefing from the parties.

## II. Discussion

The defendants seek a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651,[15] and, in the alternative, argue that we have appellate jurisdiction under the collateral order doctrine, *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). The defendants further argue that, if we do have jurisdiction under the collateral order doctrine to consider the District Court's decision not to dismiss the suit based on case-specific deference or international comity, *see Sosa*, 542 U.S. at 733 n.21, we may also recognize any defect in subject-matter jurisdiction, *see In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 488 F.3d 112, 122 (2d Cir. 2007). We address these arguments in turn.

### A. Writ of Mandamus

#### i.

As a general matter, denials of a motion to dismiss are not appealable as "final decisions" of the district courts under 28 U.S.C. § 1291.[16] *See Catlin v. United States*, 324 U.S. 229, 236 (1945). Nonetheless, federal procedural law provides two "discretionary review mechanisms" that "serve as useful 'safety valve[s]' for promptly correcting serious errors." *Mohawk Indus.*, 558 U.S. at 111 (quoting *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 883 (1994)) (alteration in original). First, a district court may certify an appeal pursuant to 28 U.S.C. § 1292(b) when it is "of the opinion that [the relevant] order involves a controlling question of law as to which there is

---

[15] The All Writs Act provides, in relevant part, that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

[16] 28 U.S.C. § 1291 provides, in relevant part, that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). When a ruling satisfies these criteria and "involves a new legal question or is of special consequence," then the district court "should not hesitate to certify an interlocutory appeal." *Mohawk*, 558 U.S. at 111. The relevant Court of Appeals may then, "in its discretion, permit an appeal to be taken from such order."[17] 28 U.S.C. § 1292(b).

If a district court refuses certification, or certification is not otherwise available, however, then a party may petition for a writ of mandamus—"a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (internal quotation marks omitted); *see also Will v. United States*, 389 U.S. 90, 107 (1967) (noting that the writ of mandamus is one of "the most potent weapons in the judicial arsenal"); note 15, *ante* (common-law remedy codified in the All Writs Act). Three conditions circumscribe use of the writ:

> First, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires—a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process. Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.

*Cheney*, 542 U.S. at 380–81 (alternations, internal quotation marks, and citations omitted). Mandamus relief is appropriate "in extraordinary circumstances," when, for example, a district court's order "amounts to a judicial usurpation of power or a clear abuse of discretion, or otherwise works a manifest injustice." *Mohawk Indus.*, 558 U.S. at 111 (alteration and internal quotation marks omitted).[18]

---

[17] "Permissive interlocutory appeal," a leading treatise observes, "can reduce the need to develop extraordinary-writ practice to fill the inevitable gaps in provisions for appeal as a matter of right." 16 Charles Alan Wright et al., *Federal Practice and Procedure* § 3929.1 (2d ed. 2013).

[18] It is important to note, however, that mandamus relief does not impeach a judge's competence and "is not a punitive remedy." *Will*, 389 U.S. at 107; *see also In re Chambers Dev. Co.*, 148 F.3d 214, 223 n.7 (3d Cir. 1998) (noting that,

Two aspects of ATS jurisprudence, however, urge greater appellate oversight through use of mandamus in appropriate cases. First, ATS suits often create particular "risks of adverse foreign policy consequences," *Sosa*, 542 U.S. at 728, obliging courts to be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs," *id.* at 727. This risk of treading into matters within the province of other branches of government, and intruding into delicate areas of intergovernmental relations, warrants closer appellate scrutiny through supervisory mandamus review. *See Cheney*, 542 U.S. at 380–82. Appellate courts have therefore been less hesitant to issue the writ when a lower-court decision threatens to affect the foreign policy of the United States. *See, e.g.*, *Ex parte Republic of Peru*, 318 U.S. 578, 586 (1943); *In re Austrian, German Holocaust Litig.*, 250 F.3d 156, 163–65 (2d Cir. 2001); *Abelesz v. OTP Bank*, 692 F.3d 638, 651 (7th Cir. 2012). Second, and relatedly, the ATS places federal judges in an unusual lawmaking role as creators of federal common law. *See Sosa*, 542 U.S. at 724–25. This exercise of authority by federal courts elevates "the danger of unwarranted judicial interference in the conduct of foreign policy," *Kiobel*, 133 S. Ct. at 1664, again warranting greater appellate oversight, *see Cheney*, 542 U.S. at 380–82. In sum, a ruling that raises substantial questions of judicial power under the

following a legislative revision in 1996, district court judges are no longer treated as respondents in mandamus actions). As we recently observed, "[t]he word 'abuse' in the 'abuse of discretion' standard is an unfortunate—and inaccurate—term of art." *In re City of New York*, 607 F.3d 923, 943 n.21 (2d Cir. 2010). A district court "abuses" its discretion if (1) it "makes an error of law," *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)), (2) makes a "clearly erroneous assessment of the evidence," *Cheney*, 542 U.S. at 381, or (3) renders a decision outside the range of permissible decisions, *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008). An abuse of discretion thus "involves nothing as heinous as *abuse*" in its ordinary connotation. *In re City of New York*, 607 F.3d at 943 n.21.

Accordingly, mandamus relief can be appropriate even when the district court's opinion resolved "novel legal questions that were unsettled" at the time of the district court's decision. *In re City of New York*, 607 F.3d at 947. Indeed, because "the writ [can] serve[ ] a vital corrective and didactic function," *Will*, 389 U.S. at 107, orders are sometimes *more* appropriate candidates for mandamus when they have "raised a legal issue of first impression in this circuit." *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 163 (2d Cir. 1992); *see also In re Sims*, 534 F.3d at 128–29; *In re United States*, 903 F.2d 88, 89 (2d Cir. 1990). The Supreme Court, for instance, has distinguished between "the ordinary situation . . . [where] mandamus is not an appropriate remedy, absent, of course, a clear abuse of discretion," from "special circumstances" where immediately reviewing a question bearing on the lower court's power would "avoid piecemeal litigation and . . . settle new and important problems." *Schlagenhauf v. Holder*, 379 U.S. 104, 111 (1964); *see also In re S.E.C.*, 374 F.3d 184, 188 n.2 (2d Cir. 2004).

17

ATS and threatens to affect significant American foreign policy objectives cannot be insulated from immediate review simply because a lower court refuses to certify the order for appeal.

Such concerns are present here. In addition to the federal common-law aspect of these ATS suits, the United States government filed a statement of interest on October 30, 2003, articulating its position that "continued adjudication of [these] matters risks potentially serious adverse consequences for significant interests of the United States."[19] Def. App'x 254. The statement of interest further explains:

> We are also concerned that adjudication of the apartheid cases may deter foreign investment where it is most needed. The United States relies, in significant part, on economic ties and investment to encourage and promote change in the domestic policies of developing countries on issues relevant to U.S. interests, such as respect for human rights and reduction of poverty. However, the prospect of costly litigation and potential liability in U.S. courts for operating in a country whose government implements oppressive policies will discourage U.S. (and other foreign) corporations from investment in many areas of the developing world.

*Id.* at 255–56. Such important foreign policy interests as those raised here cannot be vindicated by waiting until final judgment.

Nonetheless, we need not wade into the merits of the defendants' various arguments, because we are not persuaded that mandamus is the only "adequate means to attain the relief" that they desire. For the reasons explained in the following section, *see* Part II.A.ii., and in light of the Supreme Court's holding in *Kiobel* that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in the territory of another sovereign, *Kiobel*, 133 S. Ct. at 1668–69, defendants can seek the dismissal of all of the plaintiffs' claims, and prevail, prior to discovery, through a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of

---

[19] During oral argument on January 11, 2010, the government confirmed that this statement has not been modified or withdrawn.

Civil Procedure.[20]  Mandamus with respect to any of the defendants' various claims of error is,

therefore, simply unnecessary in light of the Supreme Court's clear guidance that claims based on

conduct occurring solely abroad cannot be adjudicated under the ATS.[21]

**ii.**

As we have now made clear, *Kiobel* forecloses the plaintiffs' claims because the plaintiffs have

failed to allege that any relevant conduct occurred in the United States.  The plaintiffs resist this

obvious impact of the *Kiobel* holding on their claims.  The Supreme Court's decision, they argue,

does not preclude suits under the ATS based on foreign conduct when the defendants are American

nationals, or where the defendants' conduct affronts significant American interests identified by the

plaintiffs.  *See* Plaintiffs' Letter Br. at 6–13.  Curiously, this interpretation of *Kiobel* arrives at precisely

the conclusion reached by Justice Breyer, who, writing for himself and three colleagues, only

concurred in the judgment of the Court affirming our decision to dismiss all remaining claims

brought under the ATS.  *See Kiobel*, 133 S. Ct. at 1671 (Breyer, J., concurring).  The plaintiffs'

argument, however, seeks to evade the bright-line clarity of the Court's actual holding—clarity that

ensures that the defendants can obtain their desired relief without resort to mandamus.  We briefly

highlight why the plaintiffs' arguments lack merit.

---

[20] We note that Daimler, Ford, and IBM filed answers in the District Court on June 22, 2009, thus generally barring the filing of a motion to dismiss under Rule 12(b)(6).  *See generally Kalson v. Paterson*, 542 F.3d 281, 288 n.14 (2d Cir. 2008) (explaining the relationship between Rule 12(b)(6) and Rule 12(c)).

[21] In so holding, we are mindful that a decision *denying* mandamus relief is usually, if not always, an inappropriate occasion to address novel questions of law, since the authority to issue mandamus is narrowly circumscribed, and a court considering mandamus generally does not have jurisdiction otherwise.  *But see Stein v. KPMG, LLP*, 486 F.3d 753, 759 (2d Cir. 2007) (noting that circumstances sometimes "justify the exercise of mandamus power without deciding whether we have appellate jurisdiction").  Here, however, we simply identify the clear holding of the Supreme Court's decision in *Kiobel* and explain why it plainly bars the plaintiffs' claims as a matter of law, and thus provides the defendants with an alternative avenue for obtaining their desired relief.  *Cf. Chandler v. Judicial Council of the Tenth Circuit of the U.S.*, 398 U.S. 74, 86 (1970) (denying mandamus by "conclud[ing] that in the present posture of the case other avenues of relief on the merits may yet be open" to the petitioner seeking mandamus).  Nor does the unusual posture of our decision cut off higher appellate review; the plaintiffs, should they so desire, may appeal in the normal course following entry of final judgment by the District Court.

**a.**

The Supreme Court's *Kiobel* decision, the plaintiffs assert, "adopted a new presumption that ATS claims must 'touch and concern' the United States with 'sufficient force' to state a cause of action." Plaintiffs Letter Br. 6 (quoting *Kiobel*, 133 S. Ct. at 1669). The plaintiffs read the opinion of the Court as holding only that "mere corporate presence" in the United States is insufficient for a claim to "touch and concern" the United States, but that corporate citizenship in the United States is enough. *Id.* at 11 ("[I]nternational law violations committed by U.S. citizens on foreign soil 'touch and concern' U.S. territory with 'sufficient force' to displace the *Kiobel* presumption."). Reaching a conclusion similar to that of Justice Breyer and the minority of the Supreme Court in *Kiobel*, the plaintiffs argue that whether the relevant conduct occurred abroad is simply one prong of a multi-factor test, and the ATS still reaches extraterritorial conduct when the defendant is an American national. *Id.* at 8–11.

We disagree. The Supreme Court expressly held that claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States. *Kiobel*, 133 S. Ct. at 1662, 1668–69. The majority framed the question presented in these terms no fewer than three times[22]; it repeated the same language, focusing solely on the location of the relevant "conduct" or "violation," at least eight more times in other parts of its eight-page opinion[23]; and it affirmed our judgment dismissing the plaintiffs' claims because "all the

---

[22] *See Kiobel*, 133 S. Ct. at 1662 ("The question presented is whether and under what circumstances courts may recognize a cause of action under the Alien Tort Statute, for violations of the law of nations occurring within the territory of a sovereign other than the United States."); *id.* at 1664 ("The question here is . . . whether a claim may reach conduct occurring in the territory of a foreign sovereign."); *id.* at 1665 ("[T]he question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign.").

[23] *See Kiobel*, 133 S. Ct. at 1665 (text of ATS does not support "application to torts committed abroad"); *id.* at 1666 (asking whether Congress "intend[ed] federal law to apply to conduct occurring abroad"); *id.* (no Congressional intent "for those causes of action to reach conduct in the territory of a foreign sovereign"); *id.* (historical background does not "overcome the presumption against application to conduct in the territory of another sovereign"); *id.* at 1667 ("[P]rominent contemporary examples" of ATS cases "provide no support for the proposition that Congress expected causes of action to be brought under the statute for violations of the law of nations occurring abroad."); *id.* (cause of action against pirates not "a sufficient basis for concluding that other causes of action under the ATS reach conduct that

relevant conduct took place outside the United States," *id.* at 1669. Lower courts are bound by that rule and they are without authority to "reinterpret" the Court's binding precedent in light of irrelevant factual distinctions, such as the citizenship of the defendants.[24] *See Agostini v. Felton*, 521 U.S. 203, 237–38 (1997); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996). Accordingly, if all the relevant conduct occurred abroad, that is simply the end of the matter under *Kiobel*.

In the conclusion of its opinion, the Supreme Court stated in dicta that, even when claims brought under the ATS "touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application."[25] *Kiobel*, 133 S. Ct.

---

does occur within the territory of another sovereign"); *id.* at 1668-69 ("Nothing about this historical context suggests that Congress also intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign."); *id.* at 1669 ("[P]etitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred.").

[24] Nothing in the Court's reasoning in *Kiobel* suggests that the rule of law it applied somehow depends on a defendant's citizenship. Indeed, the presumption of extraterritoriality traditionally has "focused on the site of the conduct, not the identity of the defendant." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 74-76 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (describing the history and purpose of the presumption against extraterritoriality); *see also Morrison*, 130 S. Ct. at 2884; *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 255 (1991); *Foley Bros. v. Filardo*, 336 U.S. 281, 286 (1949). The sole reference to U.S. citizenship in the Court's opinion arose in the course of discussing a 1795 opinion endorsed by Attorney General William Bradford—a lone historical source that the Court found to be ambiguous, and insufficient "to counter the weighty concerns underlying the presumption against extraterritoriality." *Kiobel*, 133 S. Ct. at 1668. Accordingly, the Court did not suggest that a defendant's citizenship has any relevance to the presumption against extraterritoriality, and it instead stated over and over that the ATS bars suits where the relevant *conduct* occurs abroad. *See* notes 22 & 23, *ante*.

[25] Part IV, which followed the Supreme Court's conclusion in Part III that "petitioner's case seeking relief for violations of the law of nations occurring outside the United States is barred," *Kiobel*, 133 S. Ct. at 1669, reads as follows:

> On these facts, all the relevant conduct took place outside the United States. And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. *See Morrison*, 130 S. Ct. at 2883–88. Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices. If Congress were to determine otherwise, a statute more specific than the ATS would be required.

*Id.* Viewing this paragraph in context, the first sentence relates to *this* case, and the second sentence relates to ATS cases not already "barred" because all of the relevant conduct occurred abroad. This dichotomy is evident from (1) the contrast between the opening clauses in these two sentences; (2) the Court's earlier conclusion that "petitioner's case . . . is barred" based solely on the extraterritoriality of the relevant conduct, without consideration of whether other aspects of the claim might "touch and concern" the United States; and (3) the Court's use of the general phrase "they must do so," rather than a case-specific phrase, such as "they do not do so." Consistent with this view, the reference to corporate presence indicates that mere corporate presence in the United States is not "relevant conduct" when deciding whether an ATS claim avoids the presumption against extraterritoriality.

at 1669 (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2883–88 (2010)). As the Court observed in *Morrison*, "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." 130 S. Ct. at 2884. But since *all* the relevant conduct in *Kiobel* occurred outside the United States—a dispositive fact in light of the Supreme Court's holding—the Court had no reason to explore, much less explain, how courts should proceed when *some* of the relevant conduct occurs in the United States.[26]

### b.

The plaintiffs also assert that "the *Kiobel* presumption is displaced here" because of the compelling American interests in supporting the struggle against apartheid in South Africa. Plaintiffs' Letter Br. 11. These case-specific policy arguments miss the mark. The canon against extraterritorial application is "a presumption about *a statute's meaning*." *Morrison*, 130 S. Ct. at 2877 (emphasis supplied). Its "wisdom," the Supreme Court has explained, is that, "[*r*]*ather than guess anew in each case*, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Id.* at 2881 (emphasis supplied). For that reason, the presumption against extraterritoriality applies to the *statute*, or at least the part of the ATS that "carries with it an opportunity to develop common law," *Sosa*, 542 U.S. at 731 n.19, and "allows

---

[26] Although joining in the opinion of the Court, Justice Alito, joined by Justice Thomas, indicated a desire to adopt a broader holding, requiring that the "domestic conduct" be "sufficient" to constitute a violation of an appropriate international law norm. *Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring). The Court did not adopt Justice Alito's broader reasoning, but it did not reject it either; the majority simply left open any questions regarding the permissible reach of causes of action under the ATS when "*some* domestic activity is involved in the case." *Morrison*, 130 S. Ct. at 2884; *see Kiobel*, 133 S. Ct. at 1669; *see also id.* (Kennedy, J., concurring). The Court also did not attempt to answer other questions involved in defining causes of action, including "who may be liable," relevant exhaustion rules, and applicable limitations periods. *See Kiobel*, 133 S. Ct. at 1665. The law of this Circuit already provides answers to some of those questions, including the principle that corporations are not proper defendants under the ATS in light of prevailing customary international law, *see Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *reh'g en banc denied*, 642 F.3d 379 (2011), *aff'd on other grounds*, 133 S. Ct. at 1669, though we have stated that other "unresolved issues [are] lurking in our ATS jurisprudence," *id.* at 117; *see also id.* at 117 n.10. Like the Supreme Court, we have no reason to address how much conduct must occur in the United States because all the relevant conduct that purportedly violated the law of nations in this case is alleged to have occurred on the territory of a foreign sovereign.

federal courts to recognize certain causes of action," *Kiobel*, 133 S. Ct. at 1664. In order "to rebut

the presumption, the ATS [*i.e.*, *the statute*] would need to evince a clear indication of

extraterritoriality." *Id.* at 1665 (quotation marks omitted)). Applying this approach in *Kiobel*, the

Supreme Court held as a matter of statutory interpretation that the implicit authority to engage in

common-law development under the ATS does not include the power to recognize causes of action

based solely on conduct occurring within the territory of another sovereign.[27] In *all* cases, therefore

the ATS does not permit claims based on illegal conduct that occurred entirely in the territory of

another sovereign. In other words, a common-law cause of action brought under the ATS cannot

have extraterritorial reach simply because some judges, in some cases, conclude that it should.

**c.**

Finally, the plaintiffs argue that the defendants "took affirmative steps in this country to

circumvent the sanctions regime, though discovery would be necessary to determine the full scope

of such U.S.-based conduct." Plaintiffs' Letter Br. 13. Without additional explanation, the plaintiffs

refer to various paragraphs in the complaints asserting that the American defendants continued to

supply the South African government with their products, notwithstanding various legal restrictions

against trade with South Africa. *See Balintulo* Compl. ¶¶ 246–50 (Ford), App'x 494–95; *id.* ¶¶ 196,

198, 212 (IBM), App'x 483, 486; *Ntsebeza* Compl. ¶ 128 (Ford), App'x 199; *id.* ¶¶ 139–41 (IBM),

App'x 202–03.

None of these paragraphs, however, ties the relevant human rights violations to actions

taken within the United States. The complaint alleges only vicarious liability of the defendant

---

[27] *See Kiobel*, 133 S. Ct. at 1665 ("[N]othing in the text of *the statute* suggests . . . extraterritorial reach." (emphasis supplied)); *id.* at 1666 ("[N]othing in *the text of the ATS* evinces the requisite clear indication of extraterritoriality." (emphasis supplied)); *id.* at 1669 ("[T]he presumption against extraterritoriality applies to claims under the ATS, and . . . nothing in *the statute* rebuts that presumption." (emphasis supplied)). Concurring only in the judgment, Justice Breyer seems to have understood the Court's opinion as leaving open whether the ATS can provide jurisdiction over "a *statutory* claim"—as opposed to whether federal courts should recognize "common-law causes of action" under the ATS—where Congress evinces sufficient intent to overcome the presumption against extraterritoriality. *Id.* at 1673 (Breyer, J., concurring) (emphasis supplied).

corporations based on the actions taken within South Africa by their South African subsidiaries. *See In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 275 (S.D.N.Y. 2009) ("[A]llegations [of an agency relationship] are sufficiently plausible to allow this claim to proceed on a theory of vicarious liability."). Because the defendants' putative agents did not commit any relevant conduct within the United States giving rise to a violation of customary international law—that is, because the asserted "violation[s] of the law of nations occurr[ed] outside the United States," *Kiobel*, 133 S. Ct. at 1669— the defendants cannot be *vicariously liable* for that conduct under the ATS.[28]

In sum, the Supreme Court's holding in *Kiobel* plainly bars the plaintiffs' claims, and the defendants will therefore be able to obtain relief in the District Court by moving for judgment on the pleadings. Accordingly, mandamus relief is denied.

### B. Collateral Order Doctrine

The defendants also assert that the district court's order denying their motion to dismiss is a "collateral order," subject to immediate appellate review. In contrast to the "discretionary review mechanisms" of certification and mandamus, *Mohawk Indus.*, 558 U.S. at 111, collateral order appeals are taken "as of right," *id.* at 112, and do not depend on an "'individualized jurisdictional inquiry,'" *id.* at 107 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473 (1978)). The parties have presented strong arguments on each side regarding the immediate appealability of the District Court's order under the collateral order doctrine,[29] but we need not confront that question now.

---

[28] To hold otherwise would conflate the extraterritoriality analysis—which asks where the "violation[ ] of the law of nations occur[red]," *Kiobel*, 133 S. Ct. at 1669—with the question of derivative liability. *See generally United States v. Bestfoods*, 524 U.S. 51, 64–65 (1998) (distinguishing "derivative liability cases . . . from those in which the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of" (internal quotation marks omitted)). This principle follows from the settled rule that claims of derivative liability depend on the viability of the underlying claim. *See, e.g., S.E.C. v. Obus*, 693 F.3d 276, 292 (2d Cir. 2012); *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013); *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 24 (1st Cir. 2009); *David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1138 (10th Cir. 2005). Of course, we need not address at this time whether derivative liability is a valid theory of liability in suits brought under the ATS.

[29] The plaintiffs argue that we lack jurisdiction under the collateral order doctrine because the defendants' arguments based on deference to foreign policy concerns are not equivalent to assertions of immunity from suit. *See*

24

The Supreme Court's decision in *Kiobel*, among other developments in ATS jurisprudence during the past four years, plainly forecloses the plaintiffs' claims as a matter of law. *See* Part II.A.ii, *ante*.

In these circumstances, the interests of judicial economy, and of the parties, are best served by holding this putative appeal under the collateral order doctrine in abeyance and enabling the District Court to consider a motion for judgment on the pleadings to dismiss the plaintiffs' remaining claims.[30] *See, e.g., Authors Guild, Inc. v. Google Inc.*, --- F.3d ----, 2013 WL 3286232 (2d Cir. July 1, 2013); *In re Sims*, 534 F.3d at 127. The parties can then inform this Court, when appropriate, that this matter has been rendered moot.

## CONCLUSION

To summarize:

1. Before issuing a writ of mandamus, a court must ensure that (1) the party seeking relief has no other adequate means of relief; (2) his right to issuance of the writ is clear; and (3) circumstances justify use of the writ.

2. In light of the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), issuance of the writ is unnecessary in this case because the defendants have an adequate means of relief through a motion for judgment on the pleadings. That is, regardless of the merits of their various arguments in favor of case-specific deference and international comity, the defendants can obtain the dismissal of all claims now that

---

*Abelesz v. OTP Bank*, 692 F.3d 638, 649–50 (7th Cir. 2012); *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 349–51 (D.C. Cir. 2007). The defendants, however, argue that collateral review is not limited to assertions of immunity from suit but also applies when "delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Indus.*, 558 U.S. at 107 (quoting *Will v. Hallock*, 546 U.S. 345, 352–53 (2006)).

[30] It is the frequent practice of this Court to remand a case for a limited purpose while an appeal is held in abeyance. *See, e.g., Hayden v. Pataki*, 449 F.3d 305, 371 (2d Cir. 2006) (*en banc*) (citing *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir. 1994)). In effect, we adopt that course here. Nonetheless, we do not formally "remand" the cause, because, having not yet recognized jurisdiction under the collateral order doctrine, we presume that the District Court "ha[s] jurisdiction to continue with the case in the absence of a stay from this Court" pending resolution of the appeal. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 53 (2d Cir. 2004). Accordingly, with the stay on the proceedings in the District Court vacated, we perceive no need to remand the cause or issue a formal mandate.

the Supreme Court in *Kiobel* has made clear that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in another country.

3. The plaintiffs' arguments that the Supreme Court's decision in *Kiobel* does not apply where the defendants are American citizens, or where the case involves American interests, are without merit.

4. Because the Supreme Court's *Kiobel* decision plainly forecloses the plaintiffs' claims as a matter of law, we do not consider whether the defendants have asserted a valid basis for "collateral order" jurisdiction under 28 U.S.C. § 1291.

Because the *Kiobel* decision, combined with the opportunity to move for dismissal in the District Court, provides an adequate ground for dismissing all remaining claims, the defendants' petition for a writ of mandamus is **DENIED**. The stay placed by this Court on proceedings in the District Court is hereby **VACATED**. Proceedings in the District Court may resume forthwith. *See* note 30, *ante*. We reserve the question whether we have jurisdiction under the collateral order doctrine and hold this putative appeal in abeyance pending further notice from the parties, provided in writing to the Clerk of this Court.